# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00305-CR

**John K. Davis Jr., Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE COUNTY COURT AT LAW NO. 1 OF COMAL COUNTY
## NO. 2006CR1644, HONORABLE RANDAL C. GRAY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted John K. Davis Jr. of the offense of driving while intoxicated. *See* Tex. Penal Code Ann. § 49.04 (West 2003). Punishment was assessed at 180 days in jail and a $2,000 fine, but the trial court suspended imposition of the sentence and placed Davis on community supervision for eighteen months. In three points of error, Davis asserts that the trial court abused its discretion in refusing to admit a set of photographs, in admitting a 911 recording, and in denying Davis a jury instruction pursuant to article 38.23 of the code of criminal procedure. We will affirm the judgment.

## BACKGROUND

The jury heard evidence that in the early morning hours of July 16, 2006, a woman claiming to be Davis's girlfriend made a 911 call. A recording of the call was admitted into evidence, over objection by defense counsel. In the call, the woman, identified as Leandra Bennett,

informed the 911 dispatcher that Davis was at her house being "verbally abusive," "in my face," and "drunk." When the dispatcher asked Bennett if Davis was intoxicated, Bennett replied, "Oh, yeah." Bennett then informed the dispatcher that Davis might be leaving her house. When the dispatcher asked Bennett what Davis was driving, Bennett told her that he was driving either a Harley Davidson Road King or a Ford F-150.

Officer Dustin Sweet of the New Braunfels Police Department was dispatched to Bennett's residence to investigate the disturbance. The dispatcher advised Officer Sweet that Davis was "extremely 1056" and might be leaving the residence. Sweet testified that "1056" refers to "an intoxicated person." As Sweet approached the subdivision where Bennett's residence was located, he observed a motorcycle leaving the subdivision and decided to follow it. Sweet testified that he observed the motorcycle "speeding as well as swaying, side-to-side." When asked how fast Davis was driving, Sweet testified that Davis was traveling 50 miles per hour in a 40-miles-per-hour zone. When asked what "position" the motorcycle was in on the road, Sweet testified, "He would go from the outside and then swing into the center and then come back out." Sweet added that the motorcycle would "go[] from the outside [of the road] and kind of back and forth."

Officer Sweet activated his overhead lights and conducted a traffic stop. A videotaped recording of the stop was admitted into evidence and played for the jury. The recording was occasionally paused so that Sweet could explain to the jury what was happening on the videotape. Sweet testified that when Davis got off of his motorcycle, he noticed that Davis was "[v]ery unsteady on his feet" and was leaning on Sweet's patrol vehicle. Sweet also testified that he could smell alcohol on Davis's breath, that Davis's speech was slurred, and

2

that Davis admitted to having "a few" drinks that night. Additionally, Sweet noticed that Davis was not wearing shoes. Davis asked Sweet, "Did Leandra call?" After determining that Leandra was Davis's girlfriend, Sweet responded, "Yeah. You weren't supposed to be there, I guess? Maybe you were being abusive?" Davis replied, "No, sir. I wasn't being abusive." Sweet proceeded to administer the standard field sobriety tests, specifically the HGN test, the walk-and-turn test, and the one-legged-stand test. Sweet explained that Davis performed poorly on all of the tests. After Davis finished attempting the tests, Sweet arrested him.

Officer Sweet testified that he suspected Davis was intoxicated based on the "totality of all the clues that [he] observed and smelled." These "clues" included what Sweet observed prior to stopping Davis:

> [Sweet]: He was not driving to his side of the road. The road is not marked, per se, but you still need to stay on half of the roadway while you are operating a vehicle.
>
> . . . .
>
> [Prosecutor]: Was the Defendant speeding?
>
> [Sweet]: Yes.
>
> [Prosecutor]: Did you receive information from dispatch?
>
> [Sweet]: Did I—
>
> [Prosecutor]: Receive information from dispatch?
>
> [Sweet]: That he had left the scene and was possibly intoxicated.

3

After the State rested, Davis testified. He explained that he leased a house with Leandra Bennett and that she was his girlfriend. When asked by defense counsel if he heard Bennett's voice on the 911 tape, Davis testified, "I heard her voice on the 911 tape. I can't be sure if that's her or that's not her. It sounds distorted to me. I can't tell if it's her or not."

Davis also described for the jury his version of what happened at Bennett's house the night of his arrest. According to Davis, when he walked into the house, Bennett was drunk and "began to attack" him. Davis recounted how Bennett told him that she was "going to call the cops." At that point, Davis testified, he left the house. Davis added, "However, being the vindictive type of person [Bennett] is, she went ahead and called the cops and, of course, had them arrest me."

Davis denied being intoxicated when he left Bennett's house, and he also denied speeding. When Davis was asked if he ever left his "lane of traffic" during the period of time depicted on the videotape, Davis testified:

> No, sir; I didn't. The only thing I did when I was driving down that road at that point in time was to avoid hazards in the road. That road is not navigable on a motorcycle at high speeds and/or in very dark conditions. It's filled and riddled with pot-holes, sways and swerves, drop-offs to the side, rocks all over it. It's in very poor condition.

Davis attempted to introduce into evidence photographs of the road. The State objected on the basis that the photographs were taken two days prior to trial and could mislead the jury about the condition of the road at the time of Davis's arrest almost one year before the photographs were taken. The trial court sustained the State's objection.

At the close of evidence, the parties proceeded to discuss the jury charge. Davis requested an article 38.23 instruction.[1] The prosecutor argued that Davis was not entitled to such a charge. The prosecutor explained:

> There is a 911 call that the officer could rely upon. There was a named individual, gave her name and said there was somebody driving intoxicated[,] gave a description of one of two types of vehicles that this person would be driving in. This officer relying on that information, saw that vehicle. It's immaterial to the stop whether or not he was speeding, which is a fact issue, because he had enough information. There was somebody leaving the scene driving this vehicle and is intoxicated. . . . Officer Sweet made a temporary detention of this individual based on a known 911 call.

Davis argued in response that Officer Sweet "could not rely upon just the 911 call to stop this vehicle because the vehicle wasn't sufficiently identified by the 911 caller, Leandra Bennett." Moreover, Davis contended, "Leandra Bennett did not testify in this trial. There's no further identification of the 911 caller's voice as Leandra Bennett. There's no trustworthiness or inherent reliability in who's making the call on the phone."

---

[1] Article 38.23 provides, in relevant part,

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.

> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

Tex. Code Crim. Proc. Ann. art. 38.23(a) (West 2005).

5

The State replied,

> The 911 call can be relied on. It's well-established law in this State to give this officer the reasonable suspicion to stop Mr. Davis. The person identified themselves, which is not necessary to give the reasonable suspicion but nevertheless the person did identify herself. She said that he would be driving one of two vehicles, either Ford F-150 or Harley Davidson Road King and indeed the officer spotted [him] coming out of that subdivision . . . driving a Harley Davidson Road King. That's the reasonable suspicion we need.

Over objection by defense counsel, the trial court declined to include an article 38.23 instruction in the jury charge.

Davis was subsequently found guilty of driving while intoxicated and placed on community supervision. This appeal followed.

**ANALYSIS**

**Article 38.23 instruction**

We will first address Davis's third point of error, in which he asserts that the trial court abused its discretion in not including an article 38.23 instruction "that would have allowed jurors to consider if the initial stop by the officer was reasonable." Davis claims that there was a fact issue as to whether Officer Sweet had reasonable suspicion to conduct a traffic stop. He points to his own testimony in which he denied speeding and denied leaving his lane of traffic, and he contends that this testimony contradicts Sweet's testimony that Davis was speeding and driving from one side of the road to the other. The State responds that part of Sweet's reasonable suspicion for conducting the stop included the 911 call, and there was no disputed fact issue on that point.

6

The terms of article 38.23(a) are "mandatory, and when an issue of fact is raised, a defendant has a statutory right to have the jury charged accordingly." *Madden v. State*, 242 S.W.3d 504, 510 (Tex. Crim. App. 2007) (quoting *Murphy v. State*, 640 S.W.2d 297, 299 (Tex. Crim. App. 1982)). However, "[a] defendant's right to the submission of jury instructions under Article 38.23(a) is limited to disputed issues of fact that are material to his claim of a constitutional or statutory violation that would render evidence inadmissible." *Id*. As the court of criminal appeals has explained,

> There must be a genuine dispute about a material fact. If there is no disputed factual issue, the legality of the conduct is determined by the trial judge alone, as a question of law. And if other facts, not in dispute, are sufficient to support the lawfulness of the challenged conduct, then the disputed fact issue is not submitted to the jury because it is not material to the ultimate admissibility of the evidence. The disputed fact must be an essential one in deciding the lawfulness of the challenged conduct.

*Id*. at 510-11.

The challenged conduct in this case was the traffic stop by Officer Sweet. The traffic stop was lawful if Sweet had reasonable suspicion to believe that Davis was driving while intoxicated. *See Ford v. State*, 158 S.W.3d 488, 492 (Tex. Crim. App. 2005) ("An officer conducts a lawful temporary detention when he has reasonable suspicion to believe that an individual is violating the law."); *State v. Nelson*, 228 S.W.3d 899, 902 (Tex. App.—Austin 2007, no pet.) ("A warrantless automobile stop is a Fourth Amendment seizure analogous to a temporary detention, and it must be justified by reasonable suspicion."). Reasonable suspicion exists if the officer has specific, articulable facts that, when combined with rational inferences from those facts, would lead him to reasonably conclude that a particular person actually is, has been, or soon will be engaged in

7

criminal activity. *Castro v. State*, 227 S.W.3d 737, 741 (Tex. Crim. App. 2007) (citing *Garcia v. State*, 43 S.W.3d 527, 530 (Tex. Crim. App. 2001)).

In this case, Officer Sweet articulated three specific facts that led him to suspect, prior to making the stop, that Davis was driving while intoxicated. First, he received information from the 911 dispatcher that Davis "had left the scene and was possibly intoxicated." Second, Sweet observed Davis speeding. Third, Sweet observed the motorcycle "swaying, side to side."

Of those facts, there was no dispute about whether Officer Sweet received the 911 dispatch. There was also no dispute about whether Davis was "swaying, side to side" in the road. Although Davis denied "leaving his lane of traffic," he did not deny Sweet's testimony that he was "swaying." To the contrary, Davis explained that the road was "filled and riddled with pot-holes, *sways and swerves*, drop-offs to the side, rocks all over it." (Emphasis added). Davis testified, "The only thing I did when I was driving down that road was to avoid hazards in the road." This testimony implies that in order to avoid these hazards, Davis was swaying and swerving.[2] Accordingly, the only disputed fact issue relevant to the lawfulness of the traffic stop was Davis's rate of speed. The question then becomes whether, given the above undisputed facts, the disputed fact was essential "in deciding the lawfulness of the challenged conduct." *See Madden*, 242 S.W.3d at 511.

On this record, we conclude that the disputed fact was not essential. The factual basis for stopping a vehicle need not arise from the officer's personal observations, but may be supplied by information acquired from another person, provided that the information acquired has

---

[2] In fact, the videotaped recording of Officer Sweet following Davis clearly shows the motorcycle moving from one side of the road to the other.

sufficient "indicia of reliability." *See Adams v. Williams*, 407 U.S. 143, 147 (1972); *Brother v. State*, 166 S.W.3d 255, 257 (Tex. Crim. App. 2005). The reliability of the information is determined by examining such factors as whether the witness identifies herself, provides the authorities with her contact information, and provides a description and location of the suspect's vehicle. *See Brother*, 166 S.W.3d at 258. Here, the 911 caller identified herself as Leandra Bennett,[3] provided the authorities with both her phone number and her address, told the authorities that Davis was drunk and that he might be driving away from her residence intoxicated, and provided a description of two vehicles Davis might be driving—either a Harley Davidson Road King or a black Ford F-150. The 911 dispatcher relayed this information to Officer Sweet. The dispatcher added that Davis was "extremely 1056." "1056," Sweet testified, referred to "an intoxicated person." As Sweet was approaching the address provided to him, he observed a motorcycle leaving the subdivision where Bennett's residence was located. As Sweet followed the motorcycle, he observed it "swaying, side to side," meaning that it "would go from the outside [of the road] and then swing into the center and then come back out." These are specific, articulable facts that, when combined with rational inferences from those facts, could lead Sweet to conclude that the driver of the motorcycle was intoxicated.

Thus, the disputed fact, Davis's rate of speed, may have increased the likelihood that Davis was driving while intoxicated, but it was not "essential" to the reasonable-suspicion determination. In other words, even if the jury had resolved the speeding issue in Davis's favor, the traffic stop still would have been lawful, and, therefore, the evidence obtained from the stop would

---

[3] Although Davis disputes whether the caller really was Bennett, Davis acknowledged in his testimony that, on the night of his arrest, Bennett "went ahead and called the cops."

9

have been admissible. Accordingly, Davis was not entitled to an article 38.23 instruction. *See, e.g., Merriweather v. State*, 501 S.W.2d 887, 891 (Tex. Crim. App. 1973) (when specific facts used by court to determine existence of probable cause were uncontested, defendant was not entitled to jury instruction concerning contested facts that did not defeat finding of probable cause); *Reynosa v. State*, 996 S.W.2d 238, 240 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (defendant not entitled to article 38.23 instruction when he testified that he did not run stop sign but did not dispute officer testimony that defendant was speeding and failed to remain in single lane of traffic); *Markey v. State*, 996 S.W.2d 226, 230-31 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (defendant not entitled to article 38.23 instruction even though he denied speeding because he did not contradict other traffic violation that officer relied upon in pulling him over).

We overrule Davis's third point of error.

**Evidence admissibility**

In his first point of error, Davis asserts that the trial court abused its discretion in refusing to admit the photographs allegedly showing the conditions of the road where Officer Sweet conducted the traffic stop. In his second point of error, Davis asserts that the trial court abused its discretion in admitting the 911 recording.

We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006). The trial court abuses its discretion only when the decision lies "outside the zone of reasonable disagreement." *Walters v. State*, 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).

We first address the admissibility of the photographs of the road. The court of criminal appeals has observed, "A picture is worth a thousand words. Yet those words, in the

context of a criminal trial, must be the right words. Otherwise, the picture from whence the words flow is inadmissible." *Erazo v. State*, 144 S.W.3d 487, 488 (Tex. Crim. App. 2004). A photograph is inadmissible "if it is substantially more prejudicial than probative." *Id*. (citing Tex. R. Evid. 403). In making this determination, courts examine the proffered evidence in light of several factors including the following: (1) the probative value of the evidence; (2) the potential to impress the jury in some irrational, yet indelible, way; (3) the time needed to develop the evidence; and (4) the proponent's need for the evidence. *Id*. at 489.

In this case, the trial court would not have abused its discretion in finding that at least three of the above factors weighed in favor of excluding the evidence. First, the trial court could have found that the probative value of the photographs was low, as they were taken approximately one year after Davis's arrest. Second, the trial court could have found that the time needed to develop the photographic evidence would have been high, as the admission of the photographs would have required additional evidence about whether the road conditions had changed, and, if so, how much they had changed, in the year following Davis's arrest. Third, the trial court could have found that Davis's need for the evidence of road conditions one year after his arrest was low. Prior to attempting to admit the photographs, Davis had already testified about the road conditions at the time of his arrest. Additionally, earlier during the trial, Officer Sweet admitted that the road conditions a few blocks prior to where he stopped Davis were "pretty bad." Thus, Davis's explanation for why he was swerving on the road was already before the jury, and the trial court could have concluded that photographs taken one year after Davis's arrest were, at best, unnecessary and, at worst, could have misled the jury into believing the road conditions were worse than they

11

actually were. On this record, we cannot conclude that the trial court's decision to exclude the photographs of the road was "outside the zone of reasonable disagreement."

We overrule Davis's first point of error.

We next address the trial court's decision to admit the 911 recording. At trial, Davis objected to admitting the recording on the grounds that the recording contained hearsay and that the admission of the recording violated his right to confront the witnesses against him. *See Davis v. Washington*, 547 U.S. 813 (2006); *Crawford v. Washington*, 541 U.S. 36 (2004). Davis carries these arguments forward on appeal. In response, the State argues that the statements on the 911 recording were not admitted for the truth of the matter asserted and, thus, are not hearsay. The State further contends that the statements on the recording were non-testimonial and, therefore, did not violate the Confrontation Clause.

We first conclude that the trial court did not abuse its discretion in admitting the recording over Davis's hearsay objection. Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Statements that are offered for the purpose of explaining how a defendant became a suspect and not for the truth of the matter asserted are not hearsay. *Dinkins v. State*, 894 S.W.2d 330, 347 (Tex. Crim. App. 1995); *Davis v. State*, 169 S.W.3d 673, 675 (Tex. App.—Fort Worth 2005, no pet.). This type of testimony is not hearsay because it merely "assists the jury's understanding of the events by providing context for the police officer's actions." *Cano v. State*, 3 S.W.3d 99, 110 (Tex. App.—Corpus Christi 1999, pet. ref'd). Here, the 911 recording was not offered to prove the truth of the matter asserted—namely, that Davis was intoxicated—but to explain the reason why Officer Sweet was dispatched to the subdivision and one

12

of the reasons why Sweet suspected that Davis was intoxicated. *See Cormier v. State*, 955 S.W.2d 161, 162 (Tex. App.—Austin 1997, no pet.) (holding that extrajudicial statements that defendant was "trafficking large amounts of cocaine" were not hearsay because they were not "offered to prove that appellant was a drug dealer but to explain why the drug task force chose to investigate him.").

Statements admitted for non-hearsay purposes do not raise Confrontation Clause concerns. *Crawford*, 541 U.S. at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)). However, even if the statements were hearsay, we further conclude that the statements were non-testimonial. Testimonial statements implicate the Confrontation Clause, while non-testimonial statements do not. *See Davis*, 547 U.S. at 821. In *Davis*, the Supreme Court explained the distinction between testimonial and non-testimonial hearsay statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id*. at 822. The Supreme Court went on to describe a non-exhaustive list of factors to consider when determining whether statements were made during an ongoing emergency: (1) whether the situation was still in progress; (2) whether the questions sought to determine what is presently happening as opposed to what has happened in the past; (3) whether the primary purpose of the interrogation was to render aid rather than to memorialize a possible crime; (4) whether the questioning was conducted in a separate room, away from the alleged attacker; and (5) whether the events were deliberately recounted in a step-by-step fashion. *Id*. at 829-30; *Vinson v. State*, 252 S.W.3d 336, 339 (Tex. Crim. App. 2008).

13

Here, the 911 recording was made while Davis was still at Bennett's house. Bennett told the dispatcher that she had had Davis "removed" from the house the day before, but that he had returned. In the middle of the call, although Bennett thought that Davis might be leaving the house, she later told the dispatcher that "he's back." Bennett also told the dispatcher that Davis was "drunk" and that he was being "verbally abusive" and "in my face." These circumstances objectively indicate that the primary purpose of the statements made during the call was to enable police assistance to meet an ongoing emergency, namely, a domestic disturbance involving at least one possibly intoxicated individual.[4] Examining the 911 call in light of the *Davis* factors, the situation was still in progress when the call was made, the questions by the dispatcher sought to determine what was presently happening, the primary purpose of the investigation was to render aid, Bennett made the call while Davis was at the house with her, and Bennett did not recount what was happening in a deliberate, "step-by-step fashion." *See Davis*, 547 U.S. at 829-30. Accordingly, we hold that Bennett's statements made during the 911 call were non-testimonial, and thus the trial court did not err in admitting the recording on the ground that its admission did not violate the Confrontation Clause.

However, even if the statements were testimonial in nature, we conclude that any error in their admission was harmless. Because the alleged error implicates the Confrontation Clause, in order to find the error harmless, we "must be convinced, beyond a reasonable doubt, that the admission of the evidence would probably not have had a significant impact on the mind of an average juror." *Davis v. State*, 203 S.W.3d 845, 852

---

[4] In fact, Officer Sweet testified that he was dispatched in response to a report of a "disturbance" and his purpose was to "investigate and make sure everything [was] safe."

14

(Tex. Crim. App. 2006). "Put another way, is there a reasonable possibility that the *Crawford* error, within the context of the entire trial, 'moved the jury from a state of non-persuasion to one of persuasion' on a particular issue?" *Id*. at 852-53. In order to answer this question, we consider the following factors: (1) the importance of the hearsay statements to the State's case; (2) whether the hearsay evidence was cumulative of other evidence; (3) the presence or absence of evidence corroborating or contradicting the hearsay testimony on material points; and (4) the overall strength of the prosecution's case. *Id*. at 852.

Setting aside the 911 recording, the State's evidence included Officer Sweet's extensive and detailed testimony about why he believed Davis was intoxicated based on his personal observations. Sweet testified that he personally observed the motorcycle speeding and swaying from one side of the road to the other. Sweet also testified that, when he stopped Davis, Davis was "very unsteady on his feet," was leaning against his patrol car, had slurred speech, and smelled of alcohol. Sweet further testified that Davis performed poorly on three standard field sobriety tests, the HGN test, the walk-and-turn test, and the one-legged-stand test. Sweet also testified that Davis admitted to having a "few" drinks that evening. Additionally, Sweet testified to the above facts while the jury was watching a videotaped recording of the traffic stop. In other words, much of what Sweet observed, the jury was able to see for itself. The videotape reflects the motorcycle swerving prior to the stop, Davis's slurred speech and unsteadiness, his admission that he had been drinking, and his poor performance on the field sobriety tests.

Furthermore, the statements in the recording of which Davis complains were cumulative of other evidence that was admitted without objection. Davis specifically complains about the statements Bennett made to the 911 dispatcher that Davis was drunk and leaving her house

15

intoxicated. However, Davis did not object when Officer Sweet testified that one of the reasons he believed Davis was intoxicated was because he received information from the 911 dispatcher that Davis had left the scene and was possibly intoxicated.

On this record, we are convinced, beyond a reasonable doubt, that any error in admitting the 911 recording did not move the jury from a state of non-persuasion to a state of persuasion on the issue of whether Davis was guilty of the offense of driving while intoxicated. Therefore, the alleged error was harmless. *See* Tex. R. App. P. 44.2(a).

We overrule Davis's second point of error.

## CONCLUSION

Having overruled Davis's points of error, we affirm the judgment of the trial court.

_____

Bob Pemberton, Justice

Before Chief Justice Law, Justices Pemberton and Waldrop

Affirmed

Filed:   August 20, 2008

Do Not Publish

16